Very interesting. Could be. I don't understand. Will the attorneys who are going to orally argue, please approach the podium and introduce yourselves. Good morning, Your Honor. I'm Mary Cannon-Veed from Bernstein & Laird, representing the appellants. Good morning, Your Honor. Todd Roden with Thompson & Coburn, representing the appellees. Okay. Both of you will have 15 minutes to argue. Appellant, reserve from that 15 minutes whatever portion you want to use for your rebuttal. Appellant, you may proceed. Thank you, Your Honor. I will try to reserve about four minutes for rebuttal. Your Honor, for the protection of policyholders in the State of Illinois and elsewhere, Illinois statute authorizes the Director of Insurance to place insurance companies in liquidation. But it's a curious kind of protection because the effect of an insurance liquidation on insurance policyholders is brutal. The policyholder is by judicial fiat for an indefinite period of time cut off from the protection of his policy. He is barred from suing the insurer even though the insurer inevitably defaults in providing him the defense and indemnity for which he's bargained. But on the other hand, no injunction stops a plaintiff from suing the insured. Nothing stays those lawsuits. They go on. And the insured, as well as the plaintiff, is allowed to submit a claim to the liquidation estate. But it is perfectly clear that no answer will be received from the liquidation estate in time to protect the policyholder from losing that lawsuit. The policyholder may also appeal to the insurance guarantee funds. And the insurance guarantee funds do a very fine job of providing the defense of the lawsuit for the policyholder. For the best utilization of your time, the focus here is on transmutation of what usually occurs. Because after the death of the child, which is the subject of the survivor's wrongful death action, the Barrington Transit Company was insured through Legion Indemnity. Legion Indemnity went into liquidation. So what they did then was they declared bankruptcy because Barrington would not have had the funds to cover this, and they got an automatic stay under the U.S. bankruptcy. So now, the crux of this is, isn't it this juncture point where there was the mediation? Yes. So let's go into the mediation and the transfer of the claims rights to the insurance that would have been available but for the liquidation. And therefore, it is under the Liquidating Act of the State of Illinois that the liquidator is the determiner of claims. So there was a talk about this, the change of the status of the parties, and what happened in empowering Barrington to believe that it would have the right to collect the balance of what was determined to be the corpus of what would have been paid to the survivors, the parents of this child. Your Honor, we included with our brief some extracts from the liquidation code, from the insurance code dealing with insurer liquidation. And what they provide is that the liquidator is in fact charged with the responsibility of determining the, or submitting for the proper claims that can be made against the liquidation estate. The insurance code does not, however, authorize the liquidator to make up whole new rules about what is a claim and what isn't. He's bound by the contracts of the insurance company and its policy holders. This Court, in the Dunkevich, in what I call the Dunkevich cases, in Ray Pinetop, there were a lot of Pinetop cases, the claims of the family of Mary Beth Dunkevich, pointed out that it is up to the court to determine who the creditors of the estate are. But it's the same rule. If the law governing those contracts does not change. So, but the insurance code also contains a provision that it is up to the claimants, the policy holders and the claimant creditors, to liquidate their claims before they can be allowed by the liquidation court. Now how do you liquidate a claim? You reduce it to dollar money value. And if you cannot do that before the deadline that's provided in the liquidation code, then you're out of luck. You're going to get kicked to the next level of priority and have to obtain approval of an estimated claim, maybe. And if you can't make it, have enough certainty for that, you're just going to be completely out of luck. Your claim is going to be completely barred. So it is not the liquidator's job to decide how much the claims are. It's the liquidator's job and the court's job to recognize the claims once the parties have liquidated them. But you had a substitution of the right to the proceeds for this. Pardon me? You had a substitution of the right to the proceeds. You had, in place of the insured, Right. the family, the members of the family, got together and funded the, certain of the, they advanced the costs for the defense themselves. But then they became the, under the terms of the agreement with the family, then they became the, would become the beneficiaries of a balance of five plus million dollars out of the, out of the proceeds of whatever was recovered. Which is They waived it. So you had, you've substituted the immediate beneficiaries of the insurance to a separate group of people who had no privity in this at all. Their only privity, Your Honor, is by assignment. This court has already held in Dunkovich that a transaction which is signed to individuals, the benefit of an insurance policy against a, and a claim against a company in liquidation is perfectly permissible. The law of Illinois is that, in general, claims may be assigned. And they may be assigned to anybody, family members, investors, whatever. Claims should be freely assignable unless there's some public policy reason that prohibits it. Now the court here initially concluded, and I think probably stuck to the position, that the claims could not be assigned because they were personal injury claims. But in fact, as this court recognized in Dunkovich and in other cases, once a case has been settled, once it has been, quote, liquidated, then it is no longer a personal injury claim. It's a contract claim. And it can be assigned like anything else. So the fact that the parties, the real question that's raised by this case, Your Honor, and I'm sympathetic to where you're trying to go, is that what exactly is it that the policy holder and the claimants are supposed to do during the ten years they can expect to wait before the liquidator gets around to addressing their claims? And the answer is, they've got to do the best they can with what's available. Now here, there were, unlike in Dunkovich, where apparently the landlord was judgment proof, there were valuable assets that the plaintiffs could get their hands on. And they wanted them, but if they had been allowed to continue to do that, what would have been the social benefit that resulted? A 70-year-old family business would have been destroyed. The community service would have been disrupted. It would have done nobody any good. There's absolutely no good, man, or beast that would have been, that would have resulted from that transaction. And that's why I understand your point. Could you discuss the liquidator's position and the liquidator's obligation to determine proof of claims and the granting of proof of claims and of being the ultimate determiner as to which claims would be granted? And to whom? As it relates to this case, this bad situation. Well, I'd have to quote from your own opinion, from this Court's own opinion, I believe even this Division, that it is the Court who is responsible for determining the, who are the creditors of a liquidated estate. It is not, there is nothing in the statute that gives the liquidator any degree of discretion in determining claims against the estate. The liquidator in this case did not argue that he had any degree of discretion to decide which were which. Now, the Court did make one line that said the liquidator chose to save the estate's assets to pay for what she considered real claims instead of these assigned ones. In other words, the, but the But there is nothing in the statute The determiner of the claim is the, is the, the liquidator makes it, makes, takes a position in front of the, in front of the Chancery Court as to what the amount of the claim should be or whether it should be allowed. Right. And the judge decides whether to accept it and holds a hearing at which the other side is permitted to present evidence and so forth. So no, the liquidator does, the liquidator gets a degree of deference, but the liquidator does not change people's contract rights by deciding that he likes this kind of claim and he doesn't like that kind of claim. The legislature established the priorities for payment of claims against the estate. It's got a whole long list of them. I think they reach up to H. These are claims D. The liquidator is not the, does not have discretion to decide which kinds of claims are better than others. But in this case, first let me thank you for your brief. These are deadly cases generally perceived by many of us, including me, in the appellate court of being deck actions are tough and then liquidator deck actions are a little tough, another level of obtuseness in your brief I thought was very, very clear. But you're relying on, as you point out, here's a case where a little girl is killed accidentally and then the people who could be held liable, your clients, come up with $1.2 million cash and they mortgage their own homes and everything they own and they're here in front of us today represented by you. But for them to prevail, you're relying on Dunkevich, one of the many Pintop cases. And in Dunkevich, the claimant in this case would have been the tally preceded against the liquidator, against the estate of the liquidated insurance company. Right. And so the problem, speaking just for myself again, can you address, doesn't your request run afoul of the general rule to avoid windfall profits for anybody? So in this case, understanding Dunkevich's stand, it's pretty clear that a harmed party can proceed directly in a liquidation case against the estate to allow an insured who settles, wouldn't you get, as Justice Simon just asked, $5.5 million more? You laid out $1.2 million plus costs and now you're going to get $7 million, less the quarter of a million given. No, actually. I don't know if it's clear in the case, but in fact the Talley family has the right to collect the amount of the settlement agreement judgment that should be paid by Fireman's Fund or Interstate National. Right. One insurance policy was assigned to the Talley family. They thought that was a better bet because it was a solvent company. Right. It puts money in hand. The policy that nobody had any faith in. Correct. The one that was a solvent insurance company is never going to pay a dime. Right. Was assigned to the people who were picking up the mess. I understand. I recognize what you're saying, though, is that now Dunkevich works well when you have a judgment-proof defendant because then it makes sense for the plaintiff to give that defendant a release in order to get hold of the right to chase the insurance company. It doesn't work so well in a situation like this where the defendant isn't judgment-proof. They weren't going to give that release. I understand that, but going back to my question about windfall profit, how is this not a windfall profit of some $5 million to Barrington and the owners of Barrington Insurance? There's a simple answer to that, Your Honor, and that is that nobody has decided the amount of the claim in this case. If the liquidator wanted to make a recommendation for what a fair and reasonable amount would have been, he could have done it and supported it with evidence. But he didn't do that. This Court may find that way, too. His only basis for that was that that was the amount that 10 years ago the plaintiffs paid in addition to all the costs of the bankruptcy and all the whole lots of other things that the liquidator didn't take into account. The Court never put us in a position where we could present evidence as to whether or not $1.2 million is an appropriate number. The Court ruled on this case as a matter of law, that the assignment of the claim of the Talley family to the Pahlke family was invalid as a matter of law, and that the judgment that was rendered against the Barrington Transportation could not be given any consideration or any weight, again, as a matter of law. So we never had the opportunity to present evidence as to what the proper amount would have been. And so worrying about a windfall is a little premature. But if, and I have developed a thriving little side practice in the last number of years, in the buying and selling of claims against Insolvent Insurance Estates. And the reason for that is they take a heck of a long time to mature and to pay off. 20, 30 years is relatively common. And people have different tolerances for how long they can afford to wait for their money. Money now can be worth a lot more than money later. And you bring in people with a long, you put together people with a long view and a short view. And there is now a thriving secondary market in claims against Insolvent Insurance Estates. There was not such a market for these people in Legion simply because the estate was so new and nobody knew anything yet. There is now. You could sell this claim. But it's not a windfall if someone buys a claim on spec and collects more money later on. If it's way too much money, a court could do something about that perhaps. But that's a question the court did not address. And there's, okay? I want you to have at least five minutes for rebuttal. So would you conclude? The immediate rationales for the court's judgments were, first of all, that this claim was not assignable. We presented extensive case law that, in fact, once a claim is settled, it's an ordinary chosen action. And, in fact, the rights under the settlement agreement may be assigned. Secondly, the court decided that the fact that a judgment was involved in the settlement with the Barrington Transportation barred consideration of the settlement. That is also incorrect. The statute does not bar any consideration of judgments reached in cases in liquidation. It bars giving them conclusive weight. Again, same point you were just making. That's not the question. We haven't got to what's the weighing of the evidence here part of this case. So the two bases on which Judge Mikva rendered her very laborious and very hard-fought decision are, in fact, incorrect and require reversal. It would be interesting to see what becomes of the rest of the case later on. We'd like the opportunity to get there. Thank you, Your Honor. Thank you. Appellee. Proceed. Thank you, Your Honor. May it please the Court, and good morning, Your Honors. Todd Roden again on behalf of the appellees, and with me is Dale Coonrod from the Office of the Special Deputy, my colleague, Joel Haber, and my colleague, Tim Bonetti. Your Honors, this case presents, I think fairly stated, an unusual situation where the liquidator has offered to pay to the claimants every dime that they paid to resolve this wrongful death personal injury claim of the parents of Christine Talley, and they reject it and insist instead that they're entitled to $4.5 million more than what they paid. There is no authority in the Illinois Insurance Code, the liquidation provisions of the Illinois Insurance Code, that allows such a strange result. There is no authority in Illinois case law that allows such a result, and the facts of this case show there's good reason for those conclusions. Let me just correct one incorrect part of my colleague's argument. The Dunkovich case did not involve an assignment. It involved a covenant not to sue, and it had the situation where the injured party retained its rights to proceed under 209-6 directly against the liquidator of the insurance company. That's a much different situation than we have, which is the injured folks, or the claimants rather, trying to assert the claims of the injured folks. And in order to resolve this case, I suggest that all the court needs to do is to look at the liquidation provisions of the Illinois Insurance Code. Specifically, we've got a complex statutory scheme that sets out precisely how these kinds of claims are to be litigated, are to be investigated, are to be resolved. The only possible claims that the appellants can assert is their own claim under 209-4, which is where the insurance company, and I think counsel described that very accurately, may assert a claim at the appropriate time and it gets evaluated. If they did that, there's no doubt all they get is $1.2 million because that's what they paid to resolve this. So it can't be that is the claim that they're really talking about, and it's not. The claim that they're really talking about, of course, is the tallies claim under 209-6, which allows an injured party to proceed directly. Now, as to that, there's a real problem for the claimants in trying to advance that claim as Judge Mikva held, and that is, first of all, personal injury claims are not assignable. There's 100 years of Illinois jurisprudence on that doctrine. They acknowledge it and concede it. Instead, they talk about, well, if you liquidate it, if you settle it, and so forth, then you can assign those kinds of claims, and we agree. If you settle a personal injury lawsuit, you have a settlement agreement. It becomes something other than a personal injury claim, and that can be assigned. It happens all the time, structured settlements, things of that nature. We don't argue that. But the problem for them is within a liquidation provision, proceeding rather, no judgment has any effect if it's entered post-order of liquidation as to liability or damages. So what happened in December of 2003 when they created the resolution of the tally claim? There was this reference to a stipulated judgment in the bankruptcy proceeding for the claim that the parents had filed there of $7.5 million. Then there was the consideration that was paid, and the stuff with the other insurance companies and the guarantee funds aren't really applicable here. But as to these claimants, or Barrington, they as the S&E of Barrington, they were to pay $1.2 million to the tally's parents, and they did. And then what did the tallies do? They acknowledged that was the sole consideration that Barrington was responsible for, and then they said, we'll assign anything that's left with respect to matters pertaining to Legion Insurance Company. Well, the essence of the assignment and their argument is this stipulated judgment. It has no effect in the liquidation proceeding because it occurred post-order of liquidation. So therefore, if the tallies had filed their claim, all they would have had is a claim under 2096, which is the personal injury claim for the wrongful death of their 10-year-old daughter. And they could have proceeded directly in the liquidation proceeding with that claim. What they can't do is assign that claim to someone else to assert on their behalf. And this discussion about we liquidate claims and we sell claims and buy claims has nothing to do with personal injury claims, has nothing to do with 2096 direct claims, and there's not a piece of case authority or statutory support for that proposition. But it sounds like there may need to be. If this is something new, if people are out there buying claims against dissolved insurers, liquidated insurers, there's going to need some law on this. Shouldn't there be? Again, whether, as Justice Harris just pointed out in the last case, it's not always best that the appellate court rule on that. It's often a better idea to Springfield's. Are you seeing more of these? Again, most of these occur under the 2094 direct insured claims. And there may need to be, Judge. There may need to be. But if there does, that's up to the Illinois General Assembly, of course, and not our courts in order to craft new provisions into the Illinois Insurance Code. But there is no case that supports what they're trying to do here and, therefore, what they're trying to do here, which is collect more than they pay. I mean, that, you know, counsel wouldn't answer your question directly about, hey, look, if you collect what you're asking for, which is $5.7 million, and you paid $1.2 million, isn't that a $4.5 million windfall? And isn't that repugnant to our case law well-developed on what insurance is supposed to be and what it's not supposed to be? And it's clear what it's not supposed to be is allow windfall recoveries. And then she started to say something about, well, it's not really that, because there were attorney's fees paid to defend this, that, and the other thing. But she never answered the question. And there can be no question, but, of course, it's a windfall. Because if you paid $1.2 million and you collect $5.5 million, the difference is more than you paid. That's a windfall in this circumstance under these cases. And they know it is because before Judge Mikva, they filed a brief that said they were entitled to, quote, unquote, a tidy profit given the facts of this case that their company was in straits because they couldn't defend the case and they didn't have the assets to do it. But that may be true, but that doesn't allow them to do what they're trying to do here. The only thing that could allow that is if they can point to a provision in the statute or they can point to controlling case authority to allow this result. They can do neither because there is no support in the statute and there is no support in the case law. And this is one of those rare cases where if you step back and you look at what happened and what they're asking the court to do, there's something wrong with that. There's just something very, very wrong with that. And, you know, the facts are clear. I don't think I need to explain more than that. And I would respectfully ask your honors to affirm Judge Mikva. Thank you. Thank you. Well, he seems to be telling us that doesn't pass the smell test. You know, your honor, I agree that the entire business, especially given who the investor is here that bought this particular claim, gives you a kind of a funny feeling. The only thing that puts me back on the straight and narrow path is all of the alternatives that were available to the parties in this case back in 2004, or 2000, yeah, at least 2004, are worse. We are facing the destruction of a business. We are facing a litigation that could be extended for a further ten years. All of those things are worse. Let me ask you this. Let me ask you this. The idea of how the insurance code works on liquidation of the states is to marshal the assets and then to pay them out on a priority basis. And so how can you square the liquidator has the discretion, obviously, do you agree, in order to determine the liquidated amount of these claims? No, your honor, I do not. You do not. Okay. And why is that? The nothing in the statute says that he does. It directs him to determine the amounts of the claims, but then to submit them to the court for approval. And as this court has said, ultimately, we don't permit private citizens or even people appointed by the director of insurance to rewrite contracts in this country. It's a constitutional matter. Well, you've said what I was getting at. The point is that the liquidator makes these ultimate determinations and the proofs of claim have to be filed in a certain period of time. But isn't the construct of the statute to take as much as is available to pay out as many of the claims as possible under the priority scheme of the statute so that if someone else gets a windfall like this, it's money that's going to basically what you've described as, I take it, an investor, that this is sort of like buying future interests in collections of proceeds in liquidated estates? It's factoring, of course. Okay. That doesn't, as I said, as I was just discussing with Judge Quinn, that is not a bad thing. And if a factor purchased a claim, for instance, not too long ago we had a bankruptcy involving the Dutch Boy Paint Company who owned a claim against Pinetop Insurance Company. And at the time nobody was sure when or if Pinetop was ever going to pay out. And they needed the money. And we held an auction in the bankruptcy court. It was a $5 million claim. The winning bidder paid $3.5 million. And six months later, less than six months later, Pinetop paid out 100 cents on the dollar. That bidder made a lot of money. That's not a windfall. That's a good investment. But the philosophy of the code is, and I don't know if you've ever seen any of the, it's not in this record obviously, but people who come in seeking enough money to get their car repaired so they can go to work. There's embedded within this code is a distribution under the fairness as defined by the Illinois General Assembly. And actually it's basically in the NAIC, National Association of Insurance Commission, these are statutes that are basically uniform. And so the philosophy of this I'm trying to get is you keep talking about this as a financial opportunity instead of something that adheres to a code that's supposed to distribute assets that are available to as many people as possible, not those who have the money to come in and buy a claim. So the disconnect here is that you have an assignment of a right from a direct insured and the person who suffered the loss to somebody who's putting a bet on it. Is that how we're supposed to determine the rights under this code? The availability of a secondary market in insurance claims benefits policyholders. Policyholders need money now. They don't need money in 10 or 15 or 20 years when the liquidator gets around to paying it out. Those policyholders, to save their family company from bankruptcy, this family needed to be able to deal with this now. They got their money back and the rest of the money would have been excess. Well, in fact, they don't have their money back to this day, Your Honor. Our motion to at least pay as much as the liquidator agreed he ought to pay was turned down by the court. That's the secondary piece of our appeal. But to say that when you make an investment in an extremely speculative, uncertain payout in the future, that you've been adequately compensated, if you get your money back, is silly. And yet if nobody was willing to make that kind of investment, this case could not have settled and the Barrington Bus Company would be out of business. But if you got the money in this case, Ms. Speed, I think Justice Simon, isn't Justice Simon correct, in that it wouldn't be coming from a liquidated insurer, it would be coming from a fund that every insurance company has kicked into? I'm sorry, I'm not hearing you properly. Where does the money come from? The $4 million, isn't the money? Well, in this case, I'm reasonably sure that it will come from a reinsurer. It will not reduce the amounts paid to policyholders by one dime. The liquidator has already decreed that every single policyholder, has already announced that every single policyholder with an allowed claim will get 100 cents on the dollar, which, by the way, nobody expected 10 years ago. Not after you pay back the guarantee funds, which have priority. And the guarantee funds have already been fully paid back, every dime, including for what they paid on this claim. The liquidator's job is to take all of the proper claims against the estate and without playing favorites or deciding which people have white hats or deciding which ones are the claims he likes better, to divide the assets that are available equitably among everybody according to the size of their claims. Now, a number of years back, the state of California and the liquidation of Executive Life Insurance Company got the bright idea that some classes of insurance policies at Executive Life were owned by investors. And they thought that those people should get treated differently. And the Supreme Court of the state of California said, uh-uh. A policy is a policy. If our legislature wants to make a different priority classification for investor-owned claims versus claims owned by mom and pop, they can do it. They do it, in fact, with the guarantee associations. We provide guarantee association protection to little guys and not big guys. But, and I differ with you just a tiny bit to chime in, Illinois is the only state in the country that has not even attempted to adopt the NAIC Model Act. And I say that as having been the reporter for the Illinois Initiative to create a thing called the Uniform Receivership Law. But it acts as though it has the Model Act, and the same philosophy runs through it. But it is not up to the liquidator to decide that one kind of claim fitting within the classifications established by the legislature is different than or better than some other kind of claim and ought to be paid first or paid in full when the other ones are not. So, if you don't have any further questions, I would be happy to. Thank you, Ms. V. Thank you to all counsels for excellent briefs and an interesting oral argument. The case is being taken under advisement. We are adjourned.